# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

## CAUSE NO. 2:18-CV-302-HAB

| | |
|---|---|
| CATALYST LIFESTYLES SPORT RESORT, LLC, | ) Appeal from the United States<br>) Bankruptcy Court<br>) Northern District of Indiana |
| Appellant, | ) Hammond Division |
| v. | )<br>) Case No. 17-23131 |
| JOSH SHERRARD, TODD THOMAE, And CITY OF PORTAGE DEPARTMENT OF REDEVELOPMENT, | )<br>) Hon. James R. Ahler<br>) |
| Appellees. | ) |

## OPINION AND ORDER

This matter comes as an appeal from the United States Bankruptcy Court for the Northern District of Indiana's Order Dismissing Case (ECF No. 4 at 365) entered on July 26, 2018 (the "Order"). Appellant Catalyst Lifestyles Sport Resort, LLC ("Catalyst") filed its Appellant's Brief (ECF No. 8) on October 16, 2018. Appellees Josh Sherrard ("Sherrard") and Todd Thomae ("Thomae") filed their Appellee's [sic] Brief (ECF No. 9) on November 16, 2018. Appellee City of Portage Department of Redevelopment ("Portage") filed its Brief of Appellee (ECF No. 11) on November 16, 2018.

The issue before the Court is whether Catalyst's operating agreement required the approval of 75% of the membership interests before bankruptcy could be filed on behalf of the LLC. For the reasons set forth below, the Order will be affirmed.

## FACTUAL BACKGROUND

Catalyst is an Indiana limited liability company formed on May 5, 2015. Catalyst is a member-managed LLC, and at all relevant times had three managers: Tony Czapla ("Czapla"),

Thomae, and Sherrard. The managers were also the members of the LLC. Czalpa held fifty percent of the membership interests, with Thomae and Sherrard holding the remaining fifty percent. As part of the formation of the LLC, the members executed the Operating Agreement of Catalyst Lifestyles Sport Resort, LLC (ECF No. 10-4 at 6–37) on May 12, 2015 (the "Operating Agreement").

Several provisions of the Operating Agreement have become the focus of this appeal. Those provisions are:

> 5.1 Management. The business and affairs of the Company shall be managed by its Managers. The Managers shall direct, manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of the Act[1], the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one of the Mangers is expressly required pursuant to this Operating Agreement or the Act.
>
> * * *
>
> 5.3 Certain Powers of Managers. Without limiting the generality of Section 5.01[2], the Managers shall have power and authority, on behalf of the Company:
>
> * * *
>
> (f)     Upon the affirmative vote of the members holding at least 75% of all Percentage Interests[3], to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;
>
> * * *

---

[1] "Act" is defined in the Operating Agreement as the "Indiana Business Organizations Act." It is unclear to the Court what law the Operating Agreement is attempting to reference with this definition. Indiana has a Uniform Business Organizations Administrative Provisions Act, Ind. Code § 23-0.5-1-1 *et seq.*, as well as a Uniform Business Organization Transactions Act, Ind. Code § 23-0.6-1-1 *et seq.*, but there is no Business Organizations Act. The parties' briefs refer to the Indiana Business Flexibility Act, Ind. Code § 23-18-1-1 *et seq.*, which is the act governing limited liability companies in Indiana.

[2] There is no "Section 5.01." The Bankruptcy Court and the parties have proceeded under the assumption that this reference was intended to be to Section 5.1, and the Court will do so as well.

[3] "Percentage Interest" is defined in the Operating Agreement as, "for any Member, the percentage interest in the Company as set forth on Exhibit A, as may be changed from time to time by the unanimous vote of the members."

2

> (h) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company;
>
> (i) To enter into any and all other agreements on behalf of the Company, in such forms as the Managers may approve;
>
> * * *
>
> 6.4 Approval of Sale of All Assets. The Members shall have the right, by the affirmative vote of the members holding at least 75% of all Percentage Interests, to approve the sale, exchange or other disposition of all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan.

(Operating Agreement at 5, 6, 9; ECF No. 10-4 at 13, 14, 17). The Operating Agreement was drafted by Attorney Ben Hughes ("Hughes") as part of a "LLC kit," which included checking name availability, filing, and other services. It is unclear what, if any, involvement Czalpa, Thomae, and Sherrard had in the drafting of the Operating Agreement. Czalpa testified that he only had a "brief conversation" with Hughes in which Czalpa shared his address and the proper spelling of his last name. (ECF No. 4 at 305). There is no evidence from Thomae or Sherrard regarding their interactions with Hughes.

Catalyst was not a successful business. This appears to be due, at least in part, to conflict between and among Czalpa, Thomae, and Sherrard. This conflict would eventually result in a flurry of court filings. On April 20, 2017, Czalpa filed a Petition for Emergency Injunction to Enforce Operating Agreement Under Indiana Code § 23-18-4-7 (the "Injunction Petition") in the Porter Circuit Court. The main issue in the Injunction Petition was Czalpa's allegation that he was improperly removed from Catalyst's bank accounts. On August 31, 2017, Thomae filed a Petition for Judicial Dissolution of Limited Liability Company and Appointment of a Receiver (the "Dissolution Petition") in the same Porter Circuit Court action. The Dissolution Petition alleged, generally, that Catalyst was insolvent and could no longer operate because Czalpa refused to work with Catalyst's other managers.

On October 25, 2017, Czalpa executed "Certified Resolutions" for Catalyst "in accordance with the authority granted each member to bind the entity as granted in Article 5.1 of the Operating Agreement." (ECF No. 4 at 151). The Certified Resolutions appointed T. Clifford Fleming ("Fleming") as Chief Restructuring Officer of Catalyst. Fleming's sole purpose in his new role was to file Chapter 11 bankruptcy on behalf of Catalyst. Catalyst's Voluntary Petition for Non-Individuals Filing for Bankruptcy (the "Bankruptcy Petition") was filed the same day as Fleming's appointment.

On November 13, 2017, Thomae and Sherrard filed their Motion to Dismiss Chapter 11 Case. Essentially, the motion argued that Thomae and Sherrard had not authorized the filing of the Bankruptcy Petition and Czalpa had no authority to file it on his own. Therefore, Catalyst lacked "corporate authority" to file for bankruptcy, and the Bankruptcy Petition should be dismissed. Portage filed a Joinder in Motion to Dismiss Chapter 11 Case on November 17, 2017, adopting Thomae and Sherrard's arguments. Catalyst filed its Response and Objection to Motion to Dismiss Chapter 11 Case, also on November 17, 2017. The Court notes that Catalyst's Response and Objection is substantively identical to the Appellant's Brief filed in this Court, albeit the Appellant's Brief omits a section from the Response and Objection addressing the Rooker-Feldman doctrine and collateral estoppel. (ECF No. 4 at 54–59).

The Bankruptcy Court held an evidentiary hearing on the Motion to Dismiss on January 23, 2018. Czalpa, Thomae, and Sherrard all testified at the hearing, primarily addressing the dysfunction in Catalyst's management. The Bankruptcy Court held another hearing on July 26, 2018, where it read its opinion granting the Motion to Dismiss into the record. The Bankruptcy Court never committed its opinion to writing, leaving the transcript of that hearing as the only

4

memorialization of the Bankruptcy Court's rationale. An Order Dismissing Case was entered by the Bankruptcy Court the same day.

## LEGAL DISCUSSION

A.   **STANDARD OF REVIEW**

In reviewing a bankruptcy court's decision pursuant to 28 U.S.C. § 158(a), the district court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the bankruptcy court's ruling. Fed. R. Bankr. P. 8013. The standard for review of bankruptcy court decisions depends upon the issue being reviewed. Findings of fact are upheld unless clearly erroneous, but legal conclusions are reviewed de novo. *Id*.; *In re Marrs–Winn*, 103 F.3d 584, 589 (7th Cir. 1996). Dismissals of bankruptcy petitions are reviewed for an abuse of discretion. *In re Hall*, 304 F.3d 743, 746 (7th Cir. 2002).

In reviewing for abuse of discretion, the district court can only reverse where a bankruptcy court's "decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re KMart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004); *see also Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004). Whether this Court agrees with the bankruptcy judge's decision is beside the point as long as the decision is within the range of options from which one would expect a reasonable trial judge to select. *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 754 (7th Cir. 2002). An abuse of discretion occurs only when no reasonable person could take the view adopted by the trial court. *United States v. Torres*, 807 F.3d 257, 261 (7th Cir. 2015).

B.   **THOMAE AND SHERRARD'S CLAIMS OF WAIVER**

In Section V. of their Appellee's [sic] Brief, Thomae and Sherrard ask this Court to summarily affirm the Bankruptcy Court in light of Catalyst's failure to file an appendix in violation

of Fed. R. Bank. P. 8018(b). Thomae and Sherrard further assert that Catalyst's arguments are "perfunctory, undeveloped and not supported by pertinent case authority," and thus claim all of Catalyst's arguments on appeal have been waived. (ECF No. 9 at 19–21). The Court rejects these arguments.

Addressing the appendix issue first, a district court has the authority to summarily affirm a bankruptcy court's judgment as a sanction for serious non-jurisdictional, procedural defects. *See Telesphere Commc'ns, Inc. v. 900 Unlimited, Inc.*, 177 F.3d 612, 616–17 (7th Cir. 1999) (affirming summary dismissal of bankruptcy appeal where counsel failed to timely file appellate brief); *In re Bulic*, 997 F.2d 299, 301–03 (7th Cir. 1993) (upholding dismissal of bankruptcy appeal for failure to designate record within required deadline); *In re Morrissey*, 349 F.3d 1187, 1189–91 (9th Cir. 2003) (upholding summary dismissal by district court where "gross procedural defects" in briefing "made review impossible"). And that power almost assuredly extends to instances where an appellant fails to file an appendix. *See Jaworski v. Master Hand Contractors, Inc.*, 882 F.3d 686, 690 (7th Cir. 2018) (entering summary affirmance as sanction where appellant failed to comply with circuit rule governing appendices that is analogous to Bankruptcy Rule 8018); *Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 226 (7th Cir. 1996) ("For more than 35 years, this court has declined to entertain appeals when the appellant does not file a required appendix.") (citation omitted). The Court finds that Catalyst's rule violations, while real, did not significantly affect the Court's ability to review the issues presented, and therefore declines to summarily affirm the Bankruptcy Court.[4]

Likewise, the Court concludes that Catalyst has not waived its arguments on appeal. While Catalyst's arguments could have been better developed, the waiver rule does not cast this Court as a legal writing professor, choosing to hear only those arguments worthy of an A. Instead, the rule

---

[4] The Court finds that Thomae and Sherrard's brief and appendix included a number of violations of the applicable rules as well, including violations of Fed. R. Bank. P. 8015(a)(2)(A), (a)(5)(A), and (a)(6).

is more akin to a pass/fail analysis: has the party presented more than a "skeletal argument," such that review is possible. *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Here, Catalyst submitted a five-page argument which cited to relevant Indiana law on contract interpretation, set forth the relevant provisions of the Operating Agreement, and provided Catalyst's view of how those provisions should be interpreted in light of the law. (ECF No. 8 at 4–8). This is a far cry from those arguments that have been found to be fatally perfunctory. *See id.* (subject argument was "a single unreasoned paragraph"); *Dalton v. Teva N. Am.*, 891 F.3d 687, 692 (7th Cir. 2018) (subject argument was "only one sentence"). Catalyst's brief is sufficient for this Court to review the claim of error on the merits, and the Court will do so now.

C. **THE BANKRUPTCY COURT'S INTERPRETATION OF THE OPERATING AGREEMENT**

Section 1112(b) of the Bankruptcy Code lists a number of non-exclusive grounds for dismissal or conversion[5] of a Chapter 11 case. See 11 U.S.C. § 1112(b). The case at bar involves one of the non-enumerated grounds: alleged lack of proper corporate authority. The authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law, *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1258 (8th Cir. 1994) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)); *Hager v. Gibson*, 188 B.R. 194, 197 (E.D. Va. 1995); *In re American Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996), and the corporate by-laws, *In re Milestone Educ. Inst., Inc.*, 167 B.R. 716, 720 (Bankr. D. Mass. 1994). The same is true for an LLC. *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858 (Bankr. N.D. Ill. 2014).

The LLC governance law in Indiana is the Indiana Business Flexibility Act, Ind. Code § 23-18-1-1 *et seq*. The Indiana legislature has determined that the purpose of the Act is to "give the

---

[5] This Court would have little trouble concluding that a liquidation under Chapter 7 qualified as the disposition of assets. The fact that Catalyst's bankruptcy case might have been converted to a Chapter 7 proceeding supports the reasonableness of the Order.

maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of limited liability companies." Ind. Code § 23-18-4-13. Therefore, the Operating Agreement must be the primary source of the authority, or lack thereof, for Czalpa to direct the filing of Catalyst's bankruptcy.

Indiana law treats operating agreements as it would other contracts. *See* Ind. Code § 23-18-1-16 (defining "operating agreement"); *Fillmore LLC v. Fillmore Mach. & Tool Co.*, 783 N.E.2d 1169, 1176–77 (Ind. Ct. App. 2003) (applying parol evidence rule to operating agreement). Accordingly, the Court must apply Indiana rules of contract construction in evaluating the parties' rights under the Operating Agreement.

The primary purpose in contract construction is to ascertain and give effect to the parties' mutual intent. *Hutchinson, Shockey, Erley & Co. v. Evansville–Vanderburgh Cty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). When a court is asked to interpret an agreement, it is necessary for the court to examine the parties' intent when they wrote the agreement. *Kelly v. Smith*, 611 N.E.2d 118, 121 (Ind. 1993). Absent ambiguity, the terms of a contract will be given their plain and ordinary meaning. *George Uzelac & Assocs., Inc. v. Guzik*, 663 N.E.2d 238, 240 (Ind. Ct. App. 1996. The terms of a contract are not considered ambiguous because the parties dispute the proper interpretation of the terms. *Id*. An ambiguity exists only where reasonable people could come to different conclusions about the contract's meaning. *Ruff v. Charter Behavioral Health Sys. of Nw. Ind., Inc.*, 699 N.E.2d 1171, 1176 (Ind. Ct. App. 1998), *trans. denied*. If a contract is ambiguous solely because of the language used in the contract and not because of extrinsic facts, then its construction is purely a question of law for the courts. *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995).

Neither a trial nor an appellate court should construe clear and unambiguous provisions, and neither court should add provisions not agreed upon by the parties. *Beazer Homes Ind., LLP v. Carriage Courts Homeowners Assoc.*, 905 N.E.2d 20, 23 (Ind. Ct. App. 2009). The power to interpret contracts does not extend to changing its terms. *Knight v. Ind. Ins. Co.*, 871 N.E.2d 357, 361 (Ind. Ct. App. 2007). A court determines the meaning of a contract from examination of all of its provisions, without giving special emphasis to any word, phrase, or paragraph. *Simon Prop. Grp. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). If the language of a contract is unambiguous, the court may not look to extrinsic evidence to expand, vary, or explain the instrument. *Beazer*, 905 N.E.2d at 23.

The parties generally agree on the starting point for analyzing the rights of managers under the Operating Agreement: Section 5.1. This section essentially has two different provisions. The first provides:

> The business and affairs of the Company shall be managed by its Managers. The Managers shall direct, manage and control the business of the Company. Except for situation in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

(ECF No. 10-4 at 13). This provision is unambiguous. It provides that, except for where control is expressly vested in the members, the LLC shall be run by the managers who will have "full and complete authority . . . to make all decisions" regarding the business, affairs, and properties of Catalyst.

The second provisions of Section 5.1 provides:

> At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one

9

of the Mangers is expressly required pursuant to this Operating Agreement or the
Act.

(*Id*.). This provision is also unambiguous. It provides that, except where limited by the Operating Agreement or Indiana law, a single manager can act unilaterally to do anything that the managers could do collectively. Since the filing of bankruptcy would fall under "the full and complete authority, power and discretion to manage and control the business, affairs and properties" of Catalyst, Section 5.1 would give a single manager the right to file bankruptcy unless: (1) that power is expressly reserved to the members; or (2) the filing must be approved by more than one of the managers pursuant to the Operating Agreement or Indiana law.

The primary checks on Czalpa's powers, according to the Appellees, are Sections 5.3(f) and 6.4 of the Operating Agreement[6]. Those sections are substantively the same: they require the vote of 75% of the membership interests to sell, exchange, or otherwise dispose of all, or substantially all, of Catalyst's property. These sections, then, unambiguously reserve to a supermajority of the members the right to sell, exchange, or dispose of the property of the LLC. If the filing of Chapter 11 bankruptcy qualifies as the sale, exchange, or disposition of Catalyst's property, then it falls under exception (1) to the unilateral powers of managers under Section 5.1, thus barring Czalpa from unilaterally filing the Bankruptcy Petition.

Neither the parties nor the Bankruptcy Court below viewed the Bankruptcy Petition as the sale or exchange of property. Instead, it is the word "dispose" or "disposition" upon which the Bankruptcy Court and the Appellees make their stand. The Appellees argue, and the Bankruptcy Court found, that the filing of the Bankruptcy Petition "disposed" of Catalyst's property by

---

[6] The Bankruptcy Court additionally identified Sections 5.12 through 5.19, which deal with management meetings. Specifically, the Bankruptcy Court stated that Section 5.1 "acts to eviscerate" these sections. (ECF No. 10-2 at 16). The Court disagrees. Sections 5.12 through 5.19 address the mechanics of meetings; where they can be held, the notice required, and how they can be held. Section 5.1 does not change or "eviscerate" these requirements, it merely provides that meetings are not necessary for management action.

transferring "all legal and equitable interests" to the trustee pursuant to 11 U.S.C. § 541(a)(1). Indeed, the United States Bankruptcy Court for the Northern District of Mississippi reached the same conclusion in *In re Mid-South Bus. Assoc., LLC*, 555 B.R. 565, 577 (Bankr. N.D. Miss. 2016), holding in the context of a Chapter 11 filing:

> In addition, under § 541 of the Bankruptcy Code, the filing of a bankruptcy petition transfers all of a debtor's interests in property to the . . . debtor's bankruptcy estate. 11 U.S.C. § 541. Because "the filing of a voluntary bankruptcy therefore automatically results in a transfer of all of the debtor's assets to the bankruptcy estate," the provision in the Operating Agreement which requires a two-thirds vote for the acquisition, sale, exchange or disposition of the Debtor's property also applies to the filing of a bankruptcy petition. Without a valid vote of the Debtor's membership, which no one alleges actually occurred, none of the members, including Dr. Windham, had the authority to sign or file the petition on behalf of the Debtor.

*Id*.

Of course, this Court is not compelled to follow the holding of *Mid-South* by the doctrine of *stare decisis*. Whether a bankruptcy court is viewed as an "inferior" court for the purposes of *stare decisis* or it is viewed as a unit of the district court, *see In re Lane*, 2010 WL 148634 at *2 (Bankr. C.D. Ill. 2010), district courts cannot be bound by the decision of a bankruptcy court because courts are bound only by the precedential authority of cases rendered by higher courts. *Miller v. United States*, 868 F.2d 236, 241 (7th Cir. 1989). *Mid-South*, then, has no precedential weight in this case.

The Court could certainly conclude that the court in *Mid-South* and the Bankruptcy Court below failed to apply the plain and ordinary meaning of "dispose," as is required under Indiana law. Regardless of the definition one chooses, "dispose" or "disposition" has a connotation of finality. *See Oxford English Dictionary*[7] ("get rid of by throwing away or giving or selling to

---

[7] https://en.oxforddictionaries.com/definition/dispose

11

someone else"); *Merriam-Webster Dictionary*[8] ("to get rid of"; "to deal with conclusively"); *Cambridge Dictionary*[9] ("to get rid of someone or something or deal with something so that the matter is finished"); *disposition*, Black's Law Dictionary (7th ed. 1999) ("the relinquishment of property"). The disposition of property, then, is not a temporary act; it is the final, conclusive relinquishment of the property.

It is the finality requirement that arguably makes the disposition of property a poor fit with the Chapter 11 process. As noted by the Bankruptcy Court, Catalyst filed the Bankruptcy Petition "in a purported attempt to reorganize," not to "liquidate them." (ECF No. 10-2 at 20–21) (distinguishing between Chapter 7 and Chapter 11 bankruptcy). A debtor in a Chapter 11 proceeding is generally a "debtor in possession"; i.e., it remains in possession of the assets and has many of the rights and duties of a trustee. 11 U.S.C. § 1107(a). Pursuant to Section 1108 of the Code, debtors in possession are automatically given leave, standing in the place of a Trustee pursuant to Section 1107, to operate their businesses after the filing of the Chapter 11. *In re UNR Indus., Inc.*, 30 B.R. 609, 612 (Bankr. N.D. Ill. 1983). Thus, while Section 541 may transfer legal title to the trustee, from a day-to-day standpoint little changes upon the filing of Chapter 11 bankruptcy.

In addition, the goal of Chapter 11 bankruptcy is to return the assets to the debtor. Section 1141 states that, "the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b). The property dealt with in the plan is returned to the debtor "free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." 11 U.S.C. § 1141(c). Not only is the transfer to the trustee under Section 541 temporary, a debtor who successfully completes the Chapter 11 process will have a greater interest in the

---

[8] https://www.merriam-webster.com/dictionary/dispose
[9] https://dictionary.cambridge.org/us/dictionary/english/dispose-of-sb-sth

property than he had previously. While this Court may not have found that the filing of the Chapter 11 bankruptcy constituted a disposition of the property, the Court cannot find that the Bankruptcy Court's finding to the contrary was so unreasonable that it constituted an abuse of discretion.

To the extent the language in the Operating Agreement is ambiguous, a reasonable construction of the language could be derived from the absence of the word "bankruptcy" from Sections 5.3(f) and 6.4. As the cases cited by Thomae and Sherrard demonstrate, parties are easily able to include provisions requiring supermajority approval for bankruptcy filings in their operating agreements. *See In re Advanced Vascular Resources of Johnstown, LLC*, 590 B.R. 323, 325 (Bankr. W.D. Penn. 2018) (requiring approval of 66% of the aggregate percentage interests to "commence any action or proceeding seeking liquidation, dissolution, reorganization or other relief under any bankruptcy, insolvency or other similar law"); *In re Pasta Bar by Scotto II, LLC*, 2015 WL 7307246 at *2 (Bankr. S.D.N.Y. 2015) (requiring approval of 75% of the percentage ownership interest to "commence any proceeding or other action on behalf of the Company . . . relating to bankruptcy, insolvency, reorganization, or relief of debtors"). It is not as if the drafter of the Operating Agreement was unaware of the term bankruptcy; the term is used in the Operating Agreement where it is intended. (ECF No. 10-4 at 12) (defining "withdrawal event" as "the death, retirement, resignation, expulsion, **bankruptcy** or dissolution of a Member") (emphasis added). While there is no evidence in the record as to why bankruptcy is referenced elsewhere in the Operating Agreement but not in Sections 5.3(f) and 6.4, it appears to the Court that perhaps the parties intended the omission. Notwithstanding, the Court cannot conclude that it was an abuse of discretion for the Bankruptcy Court to find that the filing of bankruptcy required supermajority approval under the Operating Agreement.

Finally, Indiana law requires courts to "interpret the contract as written, not as it might have been written." *B&B Oil Co. v. Stoler*, 77 N.E.3d 823, 829 (Ind. Ct. App. 2017). A court cannot "write a new contract for the parties or supply missing terms." *Id*. As in *Advanced Vascular* and *Pasta Bar*, the Operating Agreement might have been written to expressly include bankruptcy in the list of actions requiring the approval of a member supermajority. This certainly would have been the preferred course. However, it was not unreasonable for the Bankruptcy Court to have found that, despite the lack of specific reference to bankruptcy in the supermajority requirements, the filing of a Chapter 11 bankruptcy constituted a disposition of property requiring approval of a supermajority.

While this Court may have reached a different conclusion, this Court cannot say that the Bankruptcy Court's Order was an abuse of its discretion. The Bankruptcy Court was tasked with evaluating a poorly written, and by all appearances off-the-shelf, Operating Agreement. The members of Catalyst appear to have had very little involvement in the drafting of the Operating Agreement, resulting in a disconnect between what the members wanted and what the plain language of the Operating Agreement provided. In addition, the Bankruptcy Court's Order was supported by the decision in *Mid-South* which, while not binding precedent, is evidence of the reasonableness of the Order. Accordingly, this Court finds that the Order was "within the range of options from which one would expect a reasonable trial judge to select," and, therefore, was within the Bankruptcy Court's discretion. Having so determined, this Court is compelled to affirm the Order.

## CONCLUSION

For the foregoing reasons, the United States Bankruptcy Court for the Northern District of Indiana's Order Dismissing Case (ECF No. 4 at 365) is AFFIRMED.

SO ORDERED on May 22, 2019.

                                            s/ Holly A. Brady
                                            JUDGE HOLLY A. BRADY
                                            UNITED STATES DISTRICT COURT